[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 469 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 470 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 472 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 473 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 474 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 475 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 476 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 477 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 478 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 479 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 480 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 481 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 482 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 483 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 484 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 485 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 487 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 488 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 489 
This was an action of ejectment brought to recover land on the ground of a breach of the condition to pay quarter sale moneys.
The conveyance out of which the controversy arises is a lease in fee from James Van Rensselaer, of Albany, to William P. Snyder, of Claverack, dated November 23d 1785. The plaintiff, De Peyster, is the assignee of the lessor, and the defendant is the assignee of the lessee. The rent reserved in the lease was forty-eight bushels of wheat. The lessor, for himself, his heirs and assigns, also saved and reserved the one equal fourth part of all the moneys owing or that might arise by or from the selling, renting, setting over, assigning, or any how disposing of the premises leased, or any part or parcel thereof, by the said lessee, his heirs, executors, administrators and assigns, and when, and as often, and every time the same shall be sold, rented, set over, assigned or otherwise disposed of. The lessee covenanted for himself, his heirs, executors, administrators and assigns, that whenever he or they should be inclined to sell the premises, or any part thereof, he or they should make the first offer to the plaintiff in writing. If the lessor should not take it at the price required, after deducting one-fourth thereof, and all arrears of rent, the lessor covenanted to grant or permit the lessee, or his representatives, to sell or assign the premises; provided, however, that such sale or assignment should be void, and the premises should revert to the lessor, his heirs, c. unless the seller or the purchaser should pay to the lessor, his heirs, c. one-fourth part of the purchase money it should be offered for. The lease was declared therein to be given upon the express condition, that if the rent should be in arrear for forty days, or if the lessee, his heirs or assigns, c. should not perform, and keep all *Page 490 
the other covenants and conditions on his or their part to be kept and performed, then that the lessor, his heirs, c. might re-enter upon the premises and repossess and enjoy the same as his former estate.
The plaintiff proved on the trial, or gave evidence tending to show that a portion of the premises contained in the lease had been sold or assigned to the defendant without paying to the assignee of the lessor a quarter of the sale money, according to the covenant of the lessee.
The defendant insisted that the condition to pay the quarter sales, as they are commonly called, was repugnant to the estate in fee granted by the lease, and was therefore void. The judge at the circuit decided the condition to be void, and nonsuited the plaintiff. The plaintiff excepted to the decision. The supreme court, at the general term, affirmed the decision at the circuit and rendered judgment for the defendant.
The plaintiff appeals to this court, and the sole question presented on the argument is whether the condition in the lease to pay the quarter sales is valid or void.
Until the adoption of the constitution of 1846, conditions of this nature in leases for years, for lives and in fee, have not been unusual. These conditions in leases for years and for lives have been repeatedly upheld in this state as valid, although in restraint of alienation. But their validity in grants or leases in fee has been drawn in question in the supreme court, only in one case; that of Jackson v. Schutz, (18 John. 174.) That was an action of ejectment to recover for condition broken. There were two conditions in the lease; one, that the lessor should have the right of pre-emption in case of a sale by the lessee; and the other that one-tenth of the sale money should be paid to the lessor. Both conditions had been broken. There was a verdict for the plaintiff. Mr. Justice Platt, who delivered the opinion, held that the condition to pay the tenth of the sale money was valid, and that the plaintiff, for that reason, was entitled to judgment. Chief Justice Spencer was of opinion that the plaintiff was entitled to judgment on the ground that the condition giving *Page 491 
the lessor a right of pre-emption was lawful and had been broken. On the other point he expressed no opinion. That the plaintiff, in that case, was entitled to recover on the breach of the condition in relation to pre-emption was not questioned, and it seems to be entirely clear. The case states distinctly that the lessee assigned the lease without license from the lessors, and without offering the refusal to them. The decision of the other point in relation to the tenth of the sale money was unnecessary, and it may well be that it passed with little or no examination by any member of the court excepting Mr. Justice Platt. It would, therefore, be doing great wrong to other parties interested at that time or since, in the same question, to regard it as settled by the judgment in that case. That judgment never was reviewed in the court for the correction of errors. The defendant had no inducement to go there with it; because it must necessarily have been decided against him in that court on the point noticed by Chief Justice Spencer. If, therefore, on a careful examination of the decision of the supreme court in the case of Jackson v.Schutz, on the point now in controversy, it should be found to be erroneous, it ought not to be adhered to as a rule of property; and especially so in regard to the lease in question, which was made long before that decision was pronounced.
In estates for lives or years, conditions in restraint of alienation are lawful. The books are full of cases in which they have been sanctioned in England. (Platt on Covenants, 404.) In this state conditions in leases for lives and years to pay to the lessor a portion of the sale moneys have been repeatedly recognized as valid. (7 John. 531; 15 Id. 277; 7 Cowen. 285; 3 Wend. 230; 7 Hill, 253.) The foundation of the power of the lessor to restrain alienation in those cases, rests exclusively upon his ownership of the reversion. This appears byBrooke's Abridgment, Condition, 57, a. "If a man have lands for a term "of years on condition that he shall not grant over his estate, "this is good by reason of a reversion remaining inthe lessor. "The contrary of a feoffment on such condition, or that the feoffee *Page 492 
"shall not commit waste, for no right or interest remains in the "feoffor;" and according to the Touchstone, (p. 130,Preston's ed. Law Library, vol. 30,) "If a gift had been made to an "abbot and his successor, on condition not to alien, this had been "a good condition on account of the reversionary right of the "grantor, since he will be entitled to the land by way of reverter "on the dissolution of the corporation. Even on a grant in fee "to a corporation, and though the corporation may, unless "restrained by condition, alien the fee simple, yet on the dissolution "of the corporation, while owner, the reverter would be "to the grantor or his heirs, instead of there being an escheat to "the lord of the seignory."
These references are sufficient to show that the owner of the reversion, or possibility of reverter only, can restrain the alienation by his grantee in fee; and we have been referred to no case, and can find none, showing that any other interest whatever in the grantee will enable him to impose such restraint. We speak of the law as it stood previous to the constitution of 1846, which forbids the reservation of quarter sales and the like.
But it is a well established principle that where an estate in fee simple is granted, a condition that the grantee shall not alien the land is void. Littleton says, "Also, if a feoffment be "made on this condition that the feoffee shall not alien the land "to any, this condition is void; because when a man is enfeoffed "of lands or tenements, he hath the power to alien them to any "person by law. For if such a condition should be good, then "the condition should oust him of all the power which the law "gives him which should be against reason, and therefore such "a condition is void." (§ 360.)
Coke, in his commentary on this section, adds, "And the like "law is of a devise in fee upon a condition that the devisee shall "not alien, the condition is void; and so it is of a grant, release, "confirmation, or any other conveyance whereby a fee simple "doth pass." (Co. Litt. 223 a.) The language of Mr.Cruise is, "A condition annexed to the creation of an estate in fee simple "that the tenant shall not alien, is void and repugnant to the *Page 493 
"nature of the estate given; for a power of alienation is an "incident inseparably annexed to an estate in fee simple." (Cruise Dig. tit. 13, ch. 1, § 22.) The right of alienation passes by the grant of the fee as perfectly as if it were given by the express terms of the grant. Without such right the estate granted would be neither a fee simple, nor any other estate known to the law. Lands granted in fee on condition that the grantee shall not enjoy the lands, or shall not take the profits of the lands; or on condition that the heir of the grantee shall not inherit the lands; or on condition that the grantee shall not do waste, or on condition that his wife shall not be endowed, in all these and the like cases, the condition is void as repugnant to the estate. (Shep. Touchstone, 131.) "A condition "annexed to an estate given, is a divided clause from the grant, "and therefore cannot frustrate the grant precedent, neither in "anything expressed, nor in anything implied which is of its "nature incident and inseparable from the thing granted." (Hobart, "170.)
The reason why such a condition cannot be made good by agreement or consent of parties, is, that a fee simple estate and a restraint upon its alienation cannot in their nature co-exist. The ownership of the fee cannot exist in one person while the ownership of the right of alienation and of its fruits, exists in a different person. This is a principle older than the common law of England. Grotius, (Book 1, Ch. 6, § 1,) says, "Since "the establishment of property, men who are masters of their "own goods, have by the law of nature the power of disposing of, "or of transferring all or any part of their effects, to other persons; "for this is the very nature of property; I mean of full "and complete property;" and, therefore, Aristotle says, "It is "the definition of property to have in one's self the power of "alienation."
That this principle was at an early day engrafted upon the common law and applied to estates in fee, we have the authority of Littleton, as above cited, and of Coke, (2 Inst. 65.) "By the "common law it is against the nature and purity of a fee simple *Page 494 
"for the tenants to be restrained from alienation." But the rule of common law on this point, is not founded exclusively on principles of natural law. It rests also on grounds of great public utility and convenience; in facilitating the exchange of property; in simplifying its ownership, and in freeing it from embarrassments, which are injurious not only to its possessor, but to the public at large.
But it is said that the condition that the grantee shall pay one-fourth of the sale money whenever he sells the land is not repugnant to the estate, because it is not an absolute and entire restraint and prohibition; and that the grantee may make a valid conveyance of his land upon paying the grantor a part of the price. Let us examine this proposition upon reason and upon authority.
If the continuance of the estate can be made to depend on the payment of a tenth, or a sixth, or a fourth part of the value of the land at every sale, it may be made to depend on the payment of nine-tenths, or the whole of the sale money. It is impossible on any known principle to say, that a condition to pay a quarter of the sale money is valid, and a condition to pay the half or any greater proportion would be void. If we affirm the validity of a condition to pay a quarter, we must affirm a condition to pay any greater amount. It would be a bold assertion to say that the adoption of such a principle would not operate as a fatal restraint upon alienation. That which cannot be done by a direct prohibition, cannot be done indirectly. The enforcement of the restraint upon alienation by requiring money to be paid for the privilege, and by a forfeiture in case of non-payment, separates the incident of free alienation from the estate in fee as effectually as a direct prohibition. The principle of natural right, the rule of the common law, and the reasons of public policy, which forbid restraints upon the disposition of one's own property, are as effectually overthrown by the one as by the other.
The indefatigable research of the counsel for the plaintiff, has not furnished us with a single case, or a single authority from *Page 495 
the elementary writers in England in favor of the validity of such a condition in the grant of a fee simple estate, or in the grant of a fee farm lease.
There are cases where conditions not to sell, or assign to a particular person, or for a particular time, have been held good, but some of them are of doubtful authority; and they all differ from the case in controversy in this; that the condition does not appear on its face to impair the value of the lands in the hands of the grantee, and they take away from him no part of the fruits of the sale when made in conformity with the grant.
There is, however, abundant authority to show that conditions that the grantee shall not alien without paying a sum of money therefor, are unlawful restraints on alienation, and therefore void. In Mr. Preston's edition of Sheppard's Touchstone, p. 130, it is laid down that "if the condition of a feoffment or grant be that "the feoffee or grantee shall not alien the thing granted to any "person whatever; or that if he do alien to any person, he shall "pay a fine to the feoffor, those and the like conditions are void "in the case of a common person as repugnant to the estate;" [to which the editor adds, by way of explanation of the text,] "since "the condition takes away one of the incidents of ownership, "namely, the right of alienation which the law encourages."
That the word "fine" was used by the author of theTouchstone, and by Lord Coke, to denote a sum of money agreed to be paid on alienation, and not a penalty imposed by any court, can admit of no doubt. In the former sense, it is used not only in the older, but in the modern books. (Lilly's Conveyancer,
624.) Jacob, in his Law Dictionary, says the premiums given on renewal of leases are termed fines, and there are fines for alienation of copyholds paid to the lord. (Vol. 3, p. 72,ed. of 1811.) One of the definitions of the same word given byMr. Burrill, is, "a "sum of money or price paid for obtaining a benefit, favor or "privilege, as the ancient fines for obtaining a writ and for "alienation."
That a condition requiring a devisee, to pay a sum of money upon aliening the estate is void, was expressly decided in the *Page 496 
case of King v. Burchell, by Lord Keeper Henley, (Ambler,
379.) The case was shortly this: John Blunt devised lands in fee tail to his cousin, John Harris, remainder to William King and his heirs forever; with a proviso "that the bequests and "limitations of all the premises limited to his cousin, John Harris, "and his issue, male and female, is, upon this special consideration, "that if John Harris or his issue or any of them, shall "alienate, mortgage, or incumber, or commit any act or deed "whereby to alter, change, charge or defeat the bequests, he or "they should pay or cause to be paid, and he did thereby charge "the premises with £ 2,000 unto such person or persons his or "their heirs who should or ought to take next by virtue or means "of any of the bequests or limitations."
In favor of the validity of the condition it was argued, that it was not the case of a restraint but of an alternative; that is, if you bar the entail you shall pay.
On the other side it was insisted, that the proviso was against law; that it was to restrain what was incident to an estate tail, and therefore void.
Henley, Lord Keeper, (afterwards Lord Chancellor Northington,) took time to consider, and on the 20th of November, 1759, delivered his opinion that John Harris took an estate tail, andthat the proviso was repugnant to the estate. This must be regarded as a direct adjudication on the point now immediately under consideration; because if the condition to pay a sum of money upon the alienation of an entailed estate be repugnant to the estate, for the reason that it prevents or restrains alienation, it must be so a fortiori, in any other estate of inheritance.
In addition, the language of Nelson, Ch. J. in Livingston v.Stickles, (7 Hill, 257,) may be referred to; where he says the direct tendency of the covenant to pay tenth sales was to restrain alienation; and that these tenth sales are, in the nature of the ancient fines upon alienation, incident to military tenures, and for aught he could see, clog the transmission of property from hand to hand as heavily as those ancient feudal burthens long ago abolished. *Page 497 
Upon the highest legal authority, therefore, it may be affirmed that in a fee simple grant of land, a condition that the grantee shall not alien, or that he shall pay a sum of money to the grantor upon alienation, is void, on the ground that it is repugnant to the estate granted.
The lease on which this action is brought, created an estate of inheritance in the grantee, his heirs and assigns. It is a fee simple estate, subject only to the payment of the rents reserved, and to the performance of the lawful conditions contained therein. It is what was anciently called a fee farm estate. A fee farm rent is a rent charge issuing out of an estate in fee. A grant of lands in fee reserving rent, is only letting lands to farm in fee simple instead of the usual methods for life or years. (2 Black. Com. 43; Hargrave's Notes, 143 b, note 5.) A fee farm rent is a perpetual rent reserved on a conveyance infee simple. (3 Cruise, 284.) Fee farms are lands held in fee to render for them annually the true value, or more or less, and is called a fee farm because a farm rent is reserved upon a grant in fee. (2 Inst. 44.) It is expressly said in the statute ofqui emptores that it extends only to lands holden in fee simple. (1 Evans's Stat. 195.) Sir Edward Coke declares that it extends to lands held in fee farm. (2 Inst. 502.) These references are made for the purpose of showing that the estates created by leases, like the present, are estates of inheritance; that they are classed among estates in fee simple; that no reversionary interest remains in the lessor; and they are, therefore, subject to the operation of the legal principles which forbid restraints upon alienation, in all cases where no feudal relation exists between the grantor and grantee.
Restraints upon alienation of lands held in fee simple, were of feudal origin. A feoffment in fee did not originally pass an estate in the sense in which we now understand it. The purchaser took only an usufructuary interest, without the power of alienation in prejudice of the heir or of the lord. In default of heirs the tenure became extinct and the land reverted to the lord. The heir took by purchase and independent of the ancestor, *Page 498 
who could not alien, nor could the lord alien the seignory without the consent of the tenant. This restraint on alienation was a violent and unnatural state of things, contrary to the nature and value of property, and the inherent and universal love of independence. It arose partly from favor to the heir, and partly from favor to the lord, and the genius of the feudal system was originally so strong in favor of restraint upon alienation, that by a general ordinance mentioned in the book of Fiefs, the hand of him who wrote a deed of alienation was directed to be struck off. (3 Kent's Com. 506.) The same learned commentator proceeds to give an outline of the various causes which gradually led to the mitigation of these severe restrictions until they were finally removed (except as to the king's tenants in capite,) by the statute of quia emptoresterrarum.
It will be necessary to refer briefly to the English feudal tenures for the purpose of ascertaining the mode and process by which restraints upon alienation in fee were abolished in that country; and then to show that similar changes have taken place at a later period in the law of this state.
All the land in the kingdom is supposed, says Blackstone, to be holden mediately or immediately of the king, who is styled the lord paramount, or above all. Such tenants as held under the king immediately, when they granted out portions of their lands to inferior persons, became also lords with respect to those inferior persons, as they were still tenants with respect to the king, and thus partaking of a middle nature were called mesne,
or middle lords. So that if the king granted a manor to A and he granted a portion of the land to B., now B. was said to hold of A., and A. of the king; or in other words, B. held his lands immediately of A., but mediately of the king. The king, therefore, was styled lord paramount; A. was both tenant and lord, or was a mesne lord, and B. was called tenant paravail or the lowest tenant, being he who was supposed to make avail or profit of the land. (2 Bl. Com. 59.)
Out of these feudal tenures or holdings sprung certain rights and incidents, among which were fealty and escheat. Both *Page 499 
these were incidents of socage tenure, of which alone it is necessary to speak. Fealty was the obligation of fidelity which the tenant owed to his lord. Escheat was the reversion of the estate on a grant in fee simple upon a failure of the heirs of the owner. Fealty was annexed to and attendant on the reversion. They were inseparable. These incidents of feudal tenure belonged to the lord of whom the lands were immediately holden; that is to say, to him of whom the owner for the time being purchased. These grants were called subinfeudations, because they created new feudal relations between the grantor and grantee. Each grantor as the feudal lord of his grantee, was entitled to require his grantee to take the oath of fealty to him, and in case of the death of his grantee, while the owner of the land, without heirs, the grantor was entitled to the reversion or escheat.
Title by escheat in the English law, says Kent, (4 Com. 423,) was one of the fruits and consequences of feudal tenure. When the blood of the last person seised became extinct, and the title of the tenant in fee failed from want of heirs, the land resulted back, or reverted to the grantor or lord of the fee from whom it proceeded, or to his descendants or successors. The escheat was originally called the reversion. (1 Wm. Black, 133,Burgess v. Wheat.) It was so called in the time of Bracton. (Cruise, tit. 30, § 8.) It was the sole foundation on which rested the right of a grantor in fee to restrain the alienation by his grantee. The grantee, during the whole period from the conquest down to the 18th of Edward I, when the statute of quiaemptores was passed, could not alien his land without the license or consent of the lord, who was the owner of this reversionary interest.
For reasons unnecessary here to be stated, but which may be found in 2 Black. 91, and which are recited in the preamble of the statute of quia emptores, that statute was enacted. It was thereby provided, "That from henceforth it shall be lawful for "any freeman to sell at his own pleasure, his lands and tenements, "or part of them, so that the feoffee shall hold the same *Page 500 
"lands and tenements of the chief lord of the same fee, by such "service and customs as the feoffor held before."
The effect of this statute is obvious. By declaring that every freeman might sell his lands at his own pleasure, it removed the feudal restraint which prevented the tenant from selling his land without the license of his grantor, who was his feudal lord. This was a restraint imposed by the feudal law, and was not created by express contract in the deed of conveyance. It was abolished by this clause in the statute. By changing the tenure from the immediate to the superior lord, it took away the reversion from the immediate lord; in other words, from the grantor, and thus deprived him of the power of imposing the same restraint by contract or condition expressed in the deed of conveyance. The grantor's right to restrain alienation immediately ceased, when the statute put an end to the feudal relation between him and his grantee; and no instance of the exercise of that right in England, since the statute was passed, has been shown or can be found, except in the case of the king, whose tenure was not affected by the statute, and to whom, therefore, it did not apply.
The reason given by Lord Coke why a condition that the grantee shall not alien is void, is as follows: "For it is absurd and "repugnant to reason that he that hath no possibility to "have the land revert to him, should restrain his feoffee of all "his power to alien. And so it is if a man be possessed of a term "for years, or of a horse, or any other chattel, real or personal, "and give or sell his whole interest or property therein, upon condition "that the donee or vendee shall not alienate the same, the "condition is void, because his whole interest and property is out "of him, so as that he hath no possibility of reverter;
and it is "against trade and traffic and bargaining between man and man." "A man, before the statute of quia emptores, might have made "feoffment in fee, and added further, that if he or his heirs did "alien without the license, that he should pay a fine, then this "had been good; and so it is said that then the lord might have "restrained the alienation of his tenant by condition, because *Page 501 
"the lord had a possibility of reverter. And so it is "in the king's case, at this day, because he may reserve a tenure "to himself." (Co. Litt. 223 a, b.) The same distinction between restraints of alienation, by a common person and by the king, is stated in the Touchstone, p. 130. After stating, as heretofore quoted, that conditions to pay a fine upon alienation are void in the case of a common person, it is added, "But, in "case of the king, such conditions are good, since, in construction "of law, the king is the donor, and has a possibility of "reverter."
The following propositions are clearly deducible from these authorities.
1. That conditions in restraint of alienation are of feudal origin, and depended on feudal tenure. They were good wherever the grantor had the escheat or reversion.
2. That they were good before the statute of quia emptores,
because the grantor at that time was the feudal lord, and had the reversion.
3. That since the statute they are bad, because the escheat or reversion was thereby taken away from the grantor.
4. That they are good in case of the king, since the statute as before, because the statute does not take the escheat from the crown.
5. That the possibility of reverter, spoken of by Lord Coke, is the right to the escheat, and nothing more nor less.
The absence of all authority, in England, in support of conditions like that now in question, from the time of the passing of the statute of quia emptores to this day, in all estates of inheritance, whether rent be reserved or not, is a strong confirmation of the truth of these propositions; and it fully warrants the conclusion that nothing but a reversion remaining in the grantor will make such a condition valid.
One more observation however, remains to be made in relation to the law in England, before we proceed to examine whether the law in this state differs from it, or is in conformity with it. It is this: that the statute of quia emptores in England applied *Page 502 
to, and operated upon, leases in fee, or fee farm lands. For this we have the authority of Lord Coke, in these words: "and this "act [the statute of quia emptores,] extendeth to lands holden "by fee farm." (2 Inst. 501.) No doubt, therefore, can be entertained that the seignory and escheat of lands so holden were transferred by that statute from the grantor to the chief lord of the fee; and that by its operation such lands were freed from restraint upon alienation in the same way, and to the same extent, as lands conveyed in fee without reserving rents.
We now come to the inquiry, whether the law in this colony, before the revolution, differed from the law of England; and if it did, whether the statutes of this state passed shortly after its new political organization, produced any, and what change in it, with reference to the question in controversy.
The original patent or grant to Killian Van Renssalaer, under which the lands in question are said to be held, was not given in evidence, and is not made a part of this case. It is probably not material to either party that it should have been introduced. It is said that the statute of quia emptores was not in force within the colony of New-York before the revolution. In Jackson
v. Schutz, (18 John. 179,) the late Mr. Emott in his argument in favor of the validity of the tenth sales insisted that the statute of quia emptores was never in force in this state, and Chief Justice Spencer said it was never supposed that it existed here. The colonial government acted upon the supposition that it did not extend to the colony. It is well known that a number of colonial grants were made, (and the patent to Killian Van Rensselaer is said to be among the number,) by which manors were created within the province; and the patentees were authorized to grant lands within those manors to be holden of them and their heirs as immediate lords, to whom, by the feudal tenures thus created, fealty was due, and who were entitled to the reversions or escheats, in the same manner as the mesne lords in England were, before the statute of quia emptores. These manorial tenures could not have been created if that statute had extended to the province. (2 Bl. Com. 92.) Our *Page 503 
statute of tenures of the 20th of February, 1787, (1 Rev. Laws,
70,) seems to recognize the existence of these manorial tenures within this state. The fifth section saves to the mesne lords the fealty and feudal services due to them on conveyances made before the 4th of July, 1776. We shall, therefore, assume, without further examination, that the statute of quia emptores was not in force within the colony; not only because this assumption is in conformity with the action and understanding of the colonial government, but because it is most favorable to the validity of the restraints on alienation claimed by the plaintiffs.
Indeed, it follows from this assumption as a necessary consequence, that the restraints on alienation in grants in fee made in the colony before the revolution, were valid, as they were in England before the reign of Edward the First. The immediate lord or grantor was entitled to the feudal services incident to tenure in socage, and to the reversion or escheat on which the right to restrain alienation depended. But this was entirely changed by the statute of this state, passed the 22d of October, 1779, in connection with the statute of tenures, passed in 1787. Both these statutes took effect retrospectively, and operated upon all lands and tenures held under colonial grants, the one from the ninth and the other from the fourth of July, 1776. They operated therefore upon the lease in question, as if they had been passed at the time to which they related. The 14th section of the statute of 1779, is as follows: "The absolute "property of all messuages, lands, tenements and hereditaments, "and of all rents, royalties, franchises, prerogatives, privileges, "escheats, forfeitures, debts, dues, duties and services by whatsoever "names respectively, the same are called and known in the "law; and all right and title to the same, which next and immediately "before the ninth day of July, in the year 1776, did vest "in or belong, or was or were due to the crown of Great Britain, "be, and the same and each of them, hereby are declared to be, "and ever since the said ninth day of July, in the year of our "Lord 1776, to have been and forever hereafter shall be vested "in the people of this state, in whom the sovereignty and seignority *Page 504 
"thereof are and were united and vested, on and from the "said ninth day of July, in the year of our Lord 1776." (1 Jones Varick, 44.)
The first section of the statute of tenures, (1 Rev. Laws,
70,) is substantially a transcript of the statute of quiaemptores. The second section abolished military tenures and all their incidents from the 30th of August, 1664, when the province was surrendered by the Dutch to the English. It also abolished all tenure in socage in capite, with all its fruits and consequences. The third section converted all manorial and other tenures into free and common socage. The fourth section requires all conveyances and devises of any manors, lands, c. theretofore made, to be expounded as if the said manors, lands, c., had been held from the beginning in free and common socage only. The fifth section declares that the act shall not be construed to take away the rents and services due to tenure in free and common socage from the person previously entitled to them, or the fealty or distresses incident to that tenure. The third and fourth sections of this statute render it entirely immaterial to know what was the tenure under which the land in question was originally held by the patentees. Whatever else it may have been, it was converted by the statute into free and common socage. It was held of the crown until the revolution, and the crown was, until then, entitled to the escheat of all the lands remaining in the hands of the patentee and his heirs at that time.
The statute of 1779 transferred the seignory and escheat to the people of this state, who then became the chief lords of the fee. As to lands granted in fee by the proprietors of the patent before the revolution, the escheat became afterwards vested in the people of the state by the operation of the statute of tenures as soon as they changed hands by conveyance in fee, if not immediately upon the passing of the act.
These statutes performed the same functions, and wrought the same changes in the feudal tenures of this state as the statute of quia emptores did in England. They put an end to all feudal tenure between one citizen and another, and substituted *Page 505 
in its place a tenure between each landholder and the people in their sovereign capacity. They converted all rents upon leases in fee, from rent service, into rent charges, or rent seck; and by taking away the grantor's reversion or escheat, they removed the entire foundation on which the power of a grantor to restrain alienation by his grantee formerly rested; and they placed the law of this state, in respect to the question in controversy, on the same footing on which the law of England now stands and has stood since the reign of Edward the First.
The effect of these statutes upon the question in controversy being indirect and consequential, may not have been observed or understood at the time by the landholders, or the scriveners who drew their leases. The legality of these restraints on alienation in leases in fee before the revolution, and their legality in leases for lives and years before and after that period, may have led, and most probably did lead, to their continuance in leases in fee after that change in the government, and the enactment of the statutes referred to. But after a careful examination of the grounds on which these restraints on alienations in fee were originally sustained in England; of the change in the law there by statute nearly 600 years ago; of the mode in which that change was wrought; and finding that the same change has taken place here by our own statutes, we cannot entertain a doubt that the condition to pay sale money on leases in fee, is repugnant to the estate granted, and therefore void in law.
It was contended on the argument, that the reservation of rent upon the conveyance in question, distinguished this case in reference to the validity of the condition in restraint of alienation, from the case of a conveyance in fee without rent; and that the lessor, by reserving rent, retained an interest in the land, which made the condition to pay sale money valid. We think a sufficient answer has been already given to this proposition, upon the authority of Lord Coke, that the statute which changed the law of England, and made these conditions unlawful, applied as well to conveyances in fee where rent is reserved, as to conveyances where it is not. But a further answer is, that *Page 506 
a rent is not a reversion, or a possibility of reversion, and that nothing but such a reversionary interest in the land has ever been held to authorize a condition against alienation. Admitting that the rent and the land are parts of the same estate, they are not only capable of ownership by different persons, but in their nature they must belong to different persons. The grantor owns the rent, and the grantee owns the land. Each has an estate of inheritance in his own part. The right of alienation is inseparably incident to the estate of each. It is annexed to the inheritable quality of that estate. The power of the lessor to alien his rent cannot be restrained. "If a man be seised "(says Coke) of a seignory, a rent or an advowson, or any other "inheritance that lyeth in grant, and by deed granteth the same "to a man and his heirs upon condition that he shall not alien, "this condition is void." (Co. Litt. 223 a.) By the old feudal law, the tenant could not alien his fee without the lord's license; and the lord could not alien his seignory without the tenant's attornment. While the tenures were military, the lord had an interest in having a brave and loyal tenant, true to his oath of fidelity, and capable of rendering military service for his lands; and the tenant, on the other hand, was interested in living under the protection of the military chief of his own choice and adoption. The feudal restraint was mutual; but when the feudal relation between the parties was broken up, these feudal restraints were thereby dissolved; and the common law principle applicable to property not feudal, immediately took effect and rendered similar restraints created by contract entirely void.
The right of re-entry for non-payment of rent, or the non-performance of other covenants, is not such an interest in the estate as makes the condition in question valid. It is not a reversion, nor is it the possibility of reversion, nor is it any estate in the land. It is a mere right or chose in action, and if enforced, the grantor would be in by the forfeiture of a condition, and not by a reverter. At common law, a right of entry being a mere right of action, could not be granted over. (CoLitt. *Page 507 
214; 2 Cruise, tit. 18, ch. 1, § 15.) It is only by statute that the assignee of the lessor can re-enter for condition broken. But the statute only authorized the transfer of the right, and did not convert it into a reversionary interest, nor into any other estate. It is a totally different interest from the possibility of reverter spoken of by Coke, and in theTouchstone. It is no more than the possibility of a forfeiture. When property is held on condition, all the attributes and incidents of absolute property belong to it until the condition be broken; and this is especially true, when, as in this case, the person entitled to the benefit of the condition is not in any degree affected in his right, under the condition, by the exercise and enjoyment of those attributes and incidents. The lessor's right of entry for breach of the lawful conditions are not defeated or impaired by the sale of the lessee's interest in the land.
It was also said on the argument, that the quarter sale money, being reserved in the lease, was not the money of the lessee, but the money of the purchaser who buys from the lessee. If there be any force in this objection, it must rest on the ground that the reservation takes nothing from the pocket of the tenant, and is therefore no injury to him. But this is clearly a mistake. We have already seen that the grant in fee carries with it theinseparable right of alienation, and the reservation is an attempt to separate from the thing granted, an incident or quality which cannot be detached from it. Rent is separable from the ownership in fee of the land; but the right of alienation is not. The reservation of rent does not affect the alienation of the tenant's interest in the land. The reservation of the sale money restrains, and may destroy it. Besides, the reservation is an attempt to take from the tenant not only a part of the price of the land, but a part of the price of all the buildings and other improvements he may have put on it, which may be even more valuable than the land itself. These never belonged to the lessor. The obvious effect of a reservation of quarter sales, if valid, is, to discourage and prevent the tenant from making these improvements, because in case a change in his circumstances *Page 508 
should make it necessary to sell his farm, one quarter of the value of the improvements would go to his lessor. Moreover, if the reasoning of the plaintiff's counsel sustains his proposition, it proves too much; it will sustain the proposition that a like reservation is good in a grant in fee without rent; and for this no one will contend. The reservation of sale money must stand on the same footing and be liable to the same objection as the condition to pay it to the grantor. If the one restrains alienation, the other does the same thing. If one is repugnant to the estate granted, the other is equally so.
The condition in restraint of alienation cannot be sustained on the ground that it may be useful to protect the lessor's interest in the rent. The covenant of the lessee to pay, which runs with the land, and the lessor's right to re-enter for non-payment, are practically a sufficient security for the rent. But if they were not it could make no difference. The lessor, when he parted with the fee of the land, parted with his right to control the lessee's disposal of it. The rent, and the right to re-enter for non-payment are not reversionary, whatever they may be called in the lease; and it is not enough to say that they resemble, or are analogous to such interests. The condition against waste can only be imposed by the reversioner. It is repugnant to the estate granted, except where a reversion remains with the grantor. Neither the reservation of rent nor the right of re-entry for non-payment will uphold a condition against waste in a lease in fee. The condition against waste would be a much more efficient protection of the landlord's interest in the rent, than the condition to pay quarter sales; and it would be an absurdity to uphold the latter on this ground, where the former cannot be sustained.
The arguments above referred to in favor of the condition to pay sale money, are founded on the proposition that the reservation of rent, and the right of re-entry, are interests in the land remaining in the lessor, analogous to a reversion, and equivalent thereto, for the purpose of sustaining the validity of the condition. But there is no legal equivalent for a reversion *Page 509 
for that purpose. The argument is an attempt to introduce a new reason never heretofore regarded as sufficient for supporting the condition. The reasoning from analogy is still more frail and feeble. It is only on grounds strictly technical that the escheat, or any other remote reversion is made to sustain the condition, and nothing but a reversion, or the possibility of reversion, is included within that technical rule. A further examination of the force and weight of the reasons in favor of the condition, derived from supposed analogies and equivalents, would open a wide field of argument upon the general tendency of these restraints upon the transfer of property, on which we think it unnecessary to enter, and therefore forbear to do so.
Our intention has been to investigate and decide this question on strict legal authority, without adverting to any general considerations of public policy. We have examined it with great care, and feel assured of the soundness of the conclusions to which the examination has brought us. The case was most ably and learnedly argued; and this seemed to render it proper to state the grounds of our decision at greater length than would otherwise have been thought necessary.
The judgment of the supreme court ought to be affirmed.
The other members of the court, (GRIDLEY, J. absent,) concurred in the foregoing opinion.
Judgment affirmed. *Page 510